No. 24-20386

# In the United States Court of Appeals for the Fifth Circuit

IN THE MATTER OF NATIONAL CINEMEDIA, LLC, DEBTOR

AMERICAN MULTI-CINEMA, INC.; CINEMARK MEDIA, INC.; CINEMARK USA, INC., APPELLANTS

v.

NATIONAL CINEMEDIA, LLC, APPELLEE

---

IN THE MATTER OF NATIONAL CINEMEDIA, LLC, DEBTOR

AMERICAN MULTI-CINEMA, INC.; CINEMARK USA, INC., APPELLANTS

v.

NATIONAL CINEMEDIA, LLC, APPELLEE

---

*ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF TEXAS (CIV. NOS. 23-2414; 23-2485) (THE HONORABLE ANDREW S. HANEN, J.)*

---

### BRIEF OF APPELLEE NATIONAL CINEMEDIA, LLC

---

JOHN F. HIGGINS
ERIC M. ENGLISH
M. SHANE JOHNSON
MEGAN N. YOUNG-JOHN
PORTER HEDGES LLP
 *1000 Main Street, 36th Floor*
 *Houston, TX 77002*

PAUL M. BASTA
KYLE J. KIMPLER
JEFFREY J. RECHER
NINA KOVALENKO
SHAFAQ HASAN
PAUL, WEISS, RIFKIND,
  WHARTON & GARRISON LLP
 *1285 Avenue of the Americas*
 *New York, NY 10019*

# CERTIFICATE OF INTERESTED PERSONS

No. 24-20386

---

IN THE MATTER OF NATIONAL CINEMEDIA, LLC, DEBTOR

AMERICAN MULTI-CINEMA, INC.; CINEMARK MEDIA, INC.; CINEMARK USA, INC., APPELLANTS

v.

NATIONAL CINEMEDIA, LLC, APPELLEE

---

IN THE MATTER OF NATIONAL CINEMEDIA, LLC, DEBTOR

AMERICAN MULTI-CINEMA, INC.; CINEMARK USA, INC., APPELLANTS

v.

NATIONAL CINEMEDIA, LLC, APPELLEE

---

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this Court may evaluate possible disqualification or recusal:

## I.    PARTIES:

1. <u>Appellants</u>:    American Multi-Cinema, Inc., Cinemark Media, Inc., and Cinemark USA, Inc.

2. <u>Appellee</u>:      National CineMedia, LLC.  Appellee National CineMedia, LLC is co-owned by (i) its parent corporation, National CineMedia, Inc., a public corporation that holds more than 10% of National CineMedia, LLC's equity interests, through its wholly owned subsidiaries NCM Blocker Parent, LLC, NCM Blocker Sub 1, LLC, and NCM Blocker Sub 2, LLC, and (ii) NCMI II, LLC, a wholly owned subsidiary of National CineMedia, Inc.

3. <u>Other Interested Parties</u>:

> National CineMedia, Inc.
>
> NCM Blocker Parent, LLC
>
> NCM Blocker Sub 1, LLC
>
> NCM Blocker Sub 2, LLC
>
> NCMI II, LLC
>
> Regal Cinemas, Inc.
>
> The Official Committee of Unsecured Creditors, which consists of the following members:
> 1. Vector Capital Management, LP
> 2. CQS (UK), LLC
> 3. Vobile, Inc.
> 4. Goodrich Theater Opco, LLC
> 5. VSS Southern Theaters, LLC
>
> The Ad Hoc Group, which consists of the following members:
> 1. ABRY Partners II, LLC
> 2. ArrowMark Partners
> 3. Blantyre Capital Limited
> 4. Contrarian Capital Management, L.L.C.
> 5. Eaton Vance Management
> 6. Five Arrows Managers, North America LLC
> 7. Fulcra Asset Management

8.  Glendon Capital Management L.P.
9.  Intermarket Corporation
10. J.P. Morgan Investment Management Inc. & Co.
11. MJX Asset Management, LLC
12. Napier Park Global Capital (US) LP
13. Voya Alternative Asset Management LLC, Voya Investment Management Co., and Voya Investment Trust Co.
14. Wazee Street Capital Management LLC
15. Whitebox Advisors LLC

## II.   ATTORNEYS:

For Appellants:

Michael A. Swartzendruber
Kristian W. Gluck
Barton W. Cox
Cade S. Palmer
*Norton Rose Fulbright US LLP*
*2200 Ross Avenue, Suite 3600*
*Dallas, Texas 75201-7932*

Julie G. Harrison
*Norton Rose Fulbright US LLP*
*1301 McKinney Street, Suite 5100*
*Houston, Texas 77010*

David T. Kearns
*Norton Rose Fulbright US LLP*
*799 9th Street N.W., Suite 1000*
*Washington, DC 20001*

*Counsel for Cinemark USA, Inc. and Cinemark Media, Inc.*

John J. Cruciani
*Husch Blackwell LLP*
*4801 Main Street, Suite 1000*
*Kansas City, Missouri 64112*

Timothy A. Million
*Husch Blackwell LLP*
*600 Travis Street, Suite 2350*
*Houston, Texas 77002*

*Counsel for American Multi-Cinema, Inc.*

For Appellees, National CineMedia, Inc., and NCMI II, LLC:

Paul M. Basta
Kyle J. Kimpler
Jeffrey J. Recher
Nina Kovalenko
Shafaq Hasan
*Paul, Weiss, Rifkind, Wharton & Garrison LLP*
*1285 Avenue of the Americas*
*New York, NY 10019*

John F. Higgins
Eric M. English
M. Shane Johnson
Megan N. Young-John
*Porter Hedges LLP*
*1000 Main Street, 36th Floor*
*Houston, TX 77002*

For the Ad Hoc Group:

Scott J. Greenberg
Jason Zachary Goldstein
Keith R. Martorana
C. Lee Wilson
*Gibson, Dunn & Crutcher LLP*

*200 Park Avenue*
*New York, New York 10166*

For the Official Committee of Unsecured Creditors:

Charles R. Koster
*White & Case LLP*
*609 Main Street, Suite 2900*
*Houston, TX 77002*

Andrew Zatz
Harrison Denman
*White & Case LLP*
*1221 Avenue of the Americas*
*New York, NY 10020*

Erin Rosenberg
*White & Case LLP*
*111 South Wacker Drive, Suite 5100*
*Chicago, IL 60606*

For Regal Cinemas, Inc.:

Matthew D. Cavenaugh
Rebecca Blake Chaikin
Veronica A. Polnick
Vienna Anaya
*Jackson Walker LLP*
*1401 McKinney Street, Suite 1900*
*Houston, TX 77010*

Joshua A. Sussberg, P.C.
Ciara Foster
*Kirkland & Ellis LLP*
*601 Lexington Avenue*
*New York, New York 10022*

s/ *KYLE J. KIMPLER*

KYLE J. KIMPLER

*Attorney of Record for Appellee*
*National CineMedia, LLC*

NOVEMBER 27, 2024

## STATEMENT REGARDING ORAL ARGUMENT

Both the Bankruptcy Court and District Court now have denied the relief requested by Appellants American Multi-Cinema, Inc. ("AMC") and Cinemark Media, Inc. ("Cinemark") on substantively identical grounds. The issues also have been thoroughly briefed by the parties. Therefore, Appellee National CineMedia, LLC ("NCM") does not believe that oral argument is necessary to assist the Court in its determination of the straightforward issues raised by this appeal, although it welcomes the opportunity for argument if it would be helpful to the Court.

# TABLE OF CONTENTS

**Page**

Preliminary Statement ...................................................................1

Statement of Jurisdiction..............................................................7

Statement of the Issues.................................................................7

Statement of the Case...................................................................8

I.    In 2007, AMC, Cinemark, and Regal Formed NCM as a Joint Venture and Entered into the ESAs....................................8

II.   In 2007, the Parties Revised the ESAs and Entered into Several Other Integrated JV Agreements. .................................9

III.  The JV Agreements Established an Integrated Economic and Governance Arrangement for "Founding Members." ..............11

IV.   The ESAs Are Materially Different from NCM's Network Affiliate Agreements with Regional Theaters.........................13

V.    As Part of Their Equity Compensation, After Meeting CUAA Requirements, AMC, Cinemark, and Regal Could Exchange Common Units for Stock....................................14

VI.   The Pressures of the COVID-19 Pandemic Caused Both Regal and NCM to Pursue Restructuring...............................16

VII.  After Extensive Negotiations, NCM Reached a Settlement with Regal, Which the Bankruptcy Court Approved.........................17

VIII. The Bankruptcy Court Confirmed the Plan After Carefully Considering AMC's and Cinemark's Objections. ....................20

IX.   NCM's Consummated Chapter 11 Plan Involves Several Integrated, Complex Transactions....................................22

X.    Following Confirmation, NCM, NCM, Inc., and Numerous Third Parties Consummated the Restructuring Transactions.........................23

XI.   The Parties, and Constituents Not Before This Court, Have Relied on the Bankruptcy Court's Orders. ...............................24

XII.  Procedural History .................................................................25

Summary of Argument ...................................................................28

Standard of Review.......................................................................31

Argument.......................................................................................32

I.    The District Court Correctly Affirmed the Bankruptcy Court's
      Holding That the New Regal Agreement Did Not Trigger the
      MFN Clauses. .......................................................................32

      A.    The NATA Could Not and Did Not Amend the Regal ESA,
            Which Was Terminated Before the New Agreement Was
            Entered ......................................................................32

      B.    The Regal ESA and the NATA Create Fundamentally
            Different Contractual Frameworks, Further Establishing
            There Was No Amendment to the Terms of the ESA...................38

      C.    Regal Negotiated a New Agreement Because of Its
            Bankruptcy, and AMC and Cinemark May Not Take
            Advantage to Renegotiate Their Own Deals...................41

      D.    The MFN Clauses Also Were Not Triggered Because
            Regal Was Not a "Founding Member" When It Signed the
            NATA...........................................................................43

II.   The Confirmation Order Is Consistent with Section 365 of the
      Bankruptcy Code. ...............................................................45

      A.    No Defaults Under the ESAs Barred Their Assumption.............45

      B.    AMC Waived Its Objection as to When the CUAA Units
            Were Issued by Failing to Timely Raise It......................47

      C.    Because AMC's Redemption Right Was Not Triggered as
            of the Effective Date, NCM Had No Contractual
            Obligation to Redeem the CUAA Units............................49

      D.    No Authority Required NCM to Issue the CUAA Units
            Before the Effective Date or Prohibited NCM's
            Cancellation of the CUAA Units.........................................51

III.  The Appeal Should Be Dismissed as Equitably Moot.............................53

A.     The Bankruptcy Court, the District Court, and This Court All Denied AMC and Cinemark's Stay Request..............................54

B.     The Plan Has Been Substantially Consummated...........................55

C.     The Relief That AMC and Cinemark Seek Would Severely Harm the Rights of Third Parties and the Success of the Plan...................................................................................................58

Conclusion ....................................................................................................62

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re ASARCO L.L.C.*,
401 F. App'x 914 (5th Cir. 2010)..............................................................54, 58, 59

*Basic Cap. Mgmt., Inc.* v. *Dynex Cap., Inc.*,
976 F.3d 585 (5th Cir. 2020) ...................................................................23

*In re Berryman Prods., Inc.*,
159 F.3d 941 (5th Cir. 1998) ....................................................................54

*In re Black*,
225 B.R. 610 (Bankr. M.D. La. 1998).......................................................34

*In re Block Shim Dev. Co.-Irving*,
939 F.2d 289 (5th Cir. 1991) ....................................................................54

*Butner* v. *United States*,
440 U.S. 48 (1979)....................................................................................43

*In re Crystal Oil Co.*,
854 F.2d 79 (5th Cir. 1988).......................................................................62

*In re Dennis*,
330 F.3d 696 (5th Cir. 2003) ....................................................................31

*ExxonMobil Corp.* v. *Elec. Reliability Servs., Inc.*,
868 F.3d 408 (5th Cir. 2017) ....................................................................51

*In re Galaz*,
841 F.3d 316 (5th Cir. 2016) ....................................................................31

*In re Green Aggregates Inc.*,
345 F. App'x 890 (5th Cir. 2009)..............................................................54

*In re Green Hills Dev. Co., L.L.C.*,
741 F.3d 651 (5th Cir. 2014) ....................................................................54

*In re GWI PCS 1, Inc.,*
    230 F.3d 788 (5th Cir. 2000) ............................................................... 54, 56

*In re Hammersmith Dev. Co.,*
    2001 WL 184591 (5th Cir. Jan. 30, 2001)............................................... 54

*In re Heard,*
    84 B.R. 454 (Bankr. W.D. Tex. 1987)..................................................... 52

*In re Hilal,*
    226 F. App'x 381 (5th Cir. 2007)............................................................ 54

*In re IAC/Interactive Corp.,*
    948 A.2d 471 (Del. Ch. 2008) ........................................................... 36, 41

*In re Idearc, Inc.,*
    662 F.3d 315 (5th Cir. 2011) ............................................................ 53, 54

*In SVB Fin. Grp.,*
    660 B.R. 60 (Bankr. S.D.N.Y. 2024)....................................................... 48

*In re J.C. Penney Direct Mktg. Servs., LLC,*
    50 F.4th 532 (5th 2022) ......................................................................... 43

*J.C.B. Sales Ltd. v. Wallenius Lines,*
    124 F.3d 132 (2d Cir. 1997).............................................................. 34, 35

*In re Jack Cnty. Hosp. Dist.,*
    2022 WL 829172 (Bankr. N.D. Tex. Mar. 18, 2022) ............................... 46

*In re Johnson,*
    433 B.R. 626 (Bankr. S.D. Tex. 2010) .................................................... 55

*United States v. Joseph,*
    102 F.4th 686 (5th Cir. 2024)................................................................. 47

*Lorillard Tobacco Co. v. Am. Legacy Found.,*
    903 A.2d 728 (Del. 2006)........................................................................ 35

*In re Manges,*
    29 F.3d 1034 (5th Cir. 1994) ...........................................................*passim*

*In re McCray*,
    623 F. App'x 184 (5th Cir. 2015)........................................................ 54, 62

*MidCap Media Fin., LLC v. Pathway Data, Inc.*,
    929 F.3d 310 (5th Cir. 2019) ................................................................ 23

*In re Moore*,
    608 F.3d 253 (5th Cir. 2010) ................................................................ 31

*In re Nat'l Collegiate Student Loan Trs. Litig.*,
    251 A.3d 116 (Del. Ch. 2020) .............................................................. 45

*In re Nat'l Gypsum Co.*,
    208 F.3d 498 (5th Cir. 2000) ................................................................ 48

*Nemec v. Shrader*,
    991 A.2d 1120 (Del. 2010)................................................................... 36

*In re Pac. Lumber Co.*,
    584 F.3d 229 (5th Cir. 2009) ........................................................ 53, 62

*In re Patriot Place, Ltd.*,
    486 B.R. 773 (Bankr. W.D. Tex. 2013)................................................ 52

*Pers. Sec. & Safety Sys. Inc. v. Motorola Inc.*,
    297 F.3d 388 (5th Cir. 2002) ................................................................ 44

*In re Pilgrim's Pride Corp.*,
    453 B.R. 691 (Bankr. N.D. Tex. 2011) ................................................ 52

*In re Premier Ent. Biloxi LLC*,
    2009 WL 1616681 (5th Cir. June 9, 2009) .......................................... 54

*RCM LS II, LLC v. Lincoln Circle Assocs., LLC*,
    2014 WL 3706618 (Del. Ch. July 28, 2014) ........................................ 37

*S'holder Representative Servs. LLC v. HPI Holdings, LLC*,
    2023 WL 3092895 (Del. Ch. Apr. 26, 2023)................................... 33, 34

*In re San Patricio Cnty. Cmty. Action Agency*,
    575 F.3d 553 (5th Cir. 2009) ................................................................ 56

*Seaford Assocs. Ltd. P'ship* v. *Subway Real Estate Corp.*,
   2003 WL 21254847 (Del. Ch. May 21, 2003).......................................40

*Sunline Com. Carriers, Inc.* v. *CITGO Petrol. Corp.*,
   206 A.3d 836 (Del. 2019).................................................................42

*In re Thru, Inc.*,
   2018 WL 5113124 (N.D. Tex. Oct. 19, 2018)...................................59

*In re Thru, Inc.*,
   782 F. App'x 339 (5th Cir. 2019)......................................................54

*In re U.S. Brass Corp.*,
   169 F.3d 957 (5th Cir. 1999) ....................................................54, 58

*In re Ultra Petrol. Corp.*,
   2022 WL 989389 (5th Cir. Apr. 1, 2022) ...................................54, 59

*Union Oil Co. of Cal.* v. *Mobil Pipeline Co.*,
   2006 WL 3770834 (Del. Ch. Dec. 15, 2006)...................................37

*In re Yorkshire LLC*,
   540 F.3d 328 (5th Cir. 2008) ..........................................................31

## Statutes

11 U.S.C. § 363(b).................................................................................60

11 U.S.C. § 365 ............................................................................*passim*

11 U.S.C. § 1101(2)......................................................................56, 57

28 U.S.C. § 158(d)..............................................................................27

## Other Authorities

*Black's Law Dictionary* (12th ed. 2024)...............................................35

*Oxford English Dictionary* (Nov. 2024 online ed.)...............................35

Fed. R. Bankr. P. 9019.........................................................................31

Nat'l CineMedia, Inc., National CineMedia, LLC Announcing
Reverse Stock Split (Form 8-K Ex. 99.1) (Aug. 3, 2023),
https://www.sec.gov/Archives/edgar/data/1377630/0001377630
23000116/ncmllc-20230802.htm ..............................................................23

Nat'l CineMedia, Inc., National CineMedia Successfully
Completes Financial Restructuring And Announces New
Board Of Directors (Form 8-K Ex. 99.1) (Aug. 7, 2023),
https://www.sec.gov/ix?doc=/Archives/edgar/data/1377630/000
137763023000124/ncmllc-20230807.htm ..............................................57

Nat'l CineMedia, Inc., Other Events (Form 8-K) (Aug. 24, 2023),
https://www.sec.gov/ix?doc=/Archives/edgar/data/1377630/000
137763023000161/ncmllc-20230823.htm ..............................................25

## PRELIMINARY STATEMENT

This appeal marks the fifth time that American Multi-Cinema, Inc. ("AMC") and Cinemark Media, Inc. ("Cinemark") have sought to stay or reverse the Bankruptcy Court's orders confirming the restructuring plan of National CineMedia, LLC ("NCM"). Each of the Bankruptcy Court, the District Court, and this Court determined that AMC and Cinemark were unlikely to succeed on appeal, a result borne out by the District Court's complete affirmance of the Bankruptcy Court's findings and conclusions.

AMC and Cinemark's arguments have been correctly rejected at every turn because what they seek is a windfall untethered to any contractual right they may have. AMC and Cinemark's complaints stem from the reality that, when both Regal and NCM were in bankruptcy, they terminated the Exhibitor Services Agreement ("ESA") that previously governed their relationship, and Regal used the extreme leverage it had gained from bankruptcy to negotiate a new deal with NCM involving different and in some ways better terms. AMC and Cinemark, which have not filed for bankruptcy and continue to be bound by (and benefit from) their own ESAs and larger contractual relationship with NCM, are disappointed that they lack any right to negotiate similar terms. But the "most favored nation" clauses ("MFN Clauses") in AMC's and

Cinemark's ESAs, upon which they rely, are triggered only by an instrument "which amends any term of" Regal's ESA. Regal's ESA was not amended: it was terminated. Regal and NCM proceeded to enter into a new and "radically different" agreement called the Network Affiliate Transaction Agreement (the "NATA"). ROA.16762. AMC and Cinemark cannot escape the simple contractual reality that the MFN Clauses do not apply because an agreement that no longer exists—such as the terminated Regal ESA—cannot be amended.

AMC also complains, as it did below and in this Court before, that NCM could not assume certain executory contracts because those contracts required NCM to issue equity interests to AMC in a way that allowed AMC to exercise a redemption right before its interests were cancelled. This argument contravenes the applicable contracts and the restructuring plan.

The Bankruptcy Court rejected these arguments based on the evidentiary record. Both the District Court and this Court determined that these arguments were unlikely to succeed on appeal. Indeed, this Court already reviewed the same arguments presently advanced by AMC and Cinemark in considering their motion to stay the Bankruptcy Court's orders, and recognized that those arguments "fail[ed] to show a likelihood of success."

2

*Am. Multi-Cinema, Inc.* v. *Nat'l Cinemedia, LLC*, No. 23-20367, ECF No. 26-2 at 3 (5th Cir. 2023) (the "5th Cir. Stay Case"). The District Court now has affirmed the Bankruptcy Court's judgment.

Undeterred by the orders of three courts, AMC and Cinemark continue to press the same unsuccessful arguments previously made to this Court and the District Court—while failing to address the flaws in their reasoning that multiple courts now have recognized. AMC and Cinemark still fail to identify any error requiring reversal of the Bankruptcy Court's findings, and this Court should decline to grant to AMC and Cinemark an unwarranted outcome that would require unwinding NCM's hard-fought emergence from chapter 11 into "a brighter future." ROA.16763.

## The MFN Clauses Were Not Triggered

There was no error, let alone an abuse of discretion, in the Bankruptcy Court's determination that the MFN Clauses in AMC's and Cinemark's ESAs were not triggered. In response to Regal's threat to reject its ESA in bankruptcy, Regal and NCM negotiated in good faith to terminate the Regal ESA and then enter into the NATA.

As the District Court explained, "[u]nder Delaware law, the 'thing' (contract) being amended must continue to exist in order for an agreement to

3

constitute an amendment." ROA.1087 (citing *S'holder Representative Servs. LLC* v. *HPI Holdings, LLC*, 2023 WL 3092895, at *5 (Del. Ch. Apr. 26, 2023)). The Regal ESA was terminated—and therefore ceased to exist—before NCM and Regal entered into the NATA. Accordingly, the NATA could not possibly have amended any terms of the Regal ESA, and the MFN Clauses were not triggered.

The fact that AMC and Cinemark prefer some terms in the new Regal NATA to those in their ESAs is irrelevant. The MFN Clauses do not protect AMC and Cinemark against "better terms," *see* Opening Br. 37, and this Court should decline AMC and Cinemark's request to provide them privileges they failed to secure in their contracts. When Regal and NCM reached their new agreement, Regal exited the joint venture partnership it had formed to govern NCM with AMC and Cinemark and relinquished all of its corresponding rights. AMC and Cinemark seek to keep those rights, but still benefit from different terms in a different contract between Regal and NCM that set forth a different relationship that arose from Regal's bankruptcy filing. Indeed, the Bankruptcy Court found that the Regal ESA and the NATA were "fundamentally different," ROA.15587, and the District Court held that the factual record "overwhelmingly support[s]" the Bankruptcy Court's finding

that the MFN Clauses were not triggered, ROA.16762. The windfall that AMC and Cinemark seek would undermine both the plain language of the ESAs and bankruptcy policy, which seeks to preclude such opportunistic use of bankruptcy proceedings.

Furthermore, before NCM's bankruptcy filing, Regal ceased to be a "Founding Member" when it gave up its equity in NCM. During the bankruptcy case, Regal also exited the joint venture and terminated its rights under the joint venture agreements. Because the MFN Clauses can be triggered only by an instrument executed with a "Founding Member," Regal's relinquishment of its Founding Member status provides a separate basis for the Bankruptcy Court's finding that the MFN Clauses are not implicated.

## NCM's Executory Contracts Were Properly Assumed

Because NCM's entry into the NATA did not trigger the MFN Clauses, AMC and Cinemark's argument that NCM could not assume their ESAs due to a supposed failure to cure a breach of the MFN Clauses similarly fails.

AMC's separate argument regarding its purported redemption right fails as well. AMC received the equity it was entitled to under its contracts with NCM. ROA.16768. But AMC complains that this equity was cancelled when the restructuring plan became effective, before AMC could redeem it for

5

publicly traded common shares of NCM's parent. There is no case law, contractual term, or Bankruptcy Code provision showing that this cancellation of equity was improper or affording AMC an immediate right to redeem the equity upon issuance. As the District Court explained, "[w]hat AMC is really seeking is an exception to the way that all equity interests in NCM were treated under the Plan." ROA.16768.

Seeking to sidestep these insurmountable obstacles, AMC argued anew after the chapter 11 proceedings, and argues now, that NCM should have issued the equity days earlier just so that AMC could have redeemed it. AMC waived this argument by failing to raise it in the Bankruptcy Court and should not be permitted to disturb NCM's restructuring plan now with its untimely request for special treatment, which in any event finds no support in the relevant contracts or bankruptcy law. This Court should affirm the District Court's order confirming as much.

## This Appeal Is Equitably Moot

Finally, AMC and Cinemark's fifth attempt to stay or reverse the Bankruptcy Court's orders—issued 16 months ago—impermissibly risks jeopardizing the successful completion of NCM's substantially consummated restructuring plan. Because litigious parties should not be permitted to

disturb the finality of bankruptcy, this Court can and should, alternatively, dismiss AMC and Cinemak's appeal as equitably moot.

## STATEMENT OF JURISDICTION

This Court has jurisdiction as set forth in AMC and Cinemark's brief. Opening Br. 3-4.

## STATEMENT OF THE ISSUES

1.     Whether the Bankruptcy Court abused its discretion in holding that the NATA did not trigger the MFN Clauses in the AMC and Cinemark ESAs, when the MFN Clauses are triggered only by an "agreement, amendment or extension" that "amends any term of" an ESA, and the Regal ESA was terminated before Regal and NCM entered into the NATA.

2.     Whether the Bankruptcy Court abused its discretion in authorizing the assumption of the AMC and Cinemark ESAs after determining that the MFN Clauses were not triggered and that all remaining requirements to assume an executory contract under section 365 of the Bankruptcy Code were satisfied.

3.     (AMC only) Whether the Bankruptcy Court erred in concluding that the ESAs and the other integrated joint venture agreements could be assumed given that NCM was not obligated to issue the relevant equity

interests to AMC before the Plan became effective, NCM properly issued that equity when the Plan became effective, and NCM cancelled the equity alongside all other existing equity pursuant to the restructuring plan.

4.    Whether AMC and Cinemark's claims are equitably moot where the restructuring plan has been substantially consummated, and where the requested relief requires wholesale reversal of the Bankruptcy Court's orders and would eviscerate the basis on which NCM reorganized.

## STATEMENT OF THE CASE

## I. IN 2007, AMC, CINEMARK, AND REGAL FORMED NCM AS A JOINT VENTURE AND ENTERED INTO THE ESAS.

NCM owns the largest cinema advertising network in North America. NCM earns revenue primarily by selling advertising to movie theaters, displaying advertising in over 1,400 theaters. NCM's theater network consists of (i) theaters owned by the movie theater chains AMC, Cinemark, and Regal and (ii) over three dozen unaffiliated regional theater circuits (the "Network Affiliates"). ROA.15180-81.

AMC, Cinemark, and Regal formed NCM as a joint venture in 2005 to establish a cinema-advertising relationship that gave NCM exclusive access to their theaters. AMC, Cinemark, and Regal each entered into an ESA with

NCM (described further below), which set forth the terms under which advertising would be displayed at their theaters.

## II.    IN 2007, THE PARTIES REVISED THE ESAS AND ENTERED INTO SEVERAL OTHER INTEGRATED JV AGREEMENTS.

NCM, AMC, Cinemark, and Regal restructured NCM in February 2007 (the "2007 Transaction"), resulting in significant benefits to the theater chains. That transaction was effectuated as follows:

- NCM, Inc. was formed as a public holding company to serve as the member manager of NCM;

- NCM, Inc. completed an IPO;

- NCM, Inc. used the net proceeds from the IPO to buy approximately 45% of NCM's membership units, making $746.1 million in payments to NCM and $78.5 million directly to AMC, Cinemark, and Regal;

- NCM took on $805 million of debt under a senior secured credit facility; and

- NCM used the total proceeds of $1.5 billion from NCM, Inc.'s purchase of NCM's membership units and its credit facility to pay AMC, Cinemark, and Regal (a) $686.3 million as consideration for entering into new long-term ESAs (described further below) and (b) $769.7 million to redeem preferred units of NCM that were created before the IPO and held by AMC, Cinemark, and Regal.

ROA.15183.

The 2007 Transaction resulted in NCM's current "Up-C" Structure, where a public entity (here, NCM, Inc.) is formed as a holding company with

no material assets other than its equity interest in the partnership (here, NCM). NCM entered into the 2007 Transaction and undertook significant debt in exchange for AMC's, Cinemark's, and Regal's agreements to, among other things, extend the ESA terms from five to 30 years[1] and guarantee exclusivity during the extended term. ROA.15183-84. As far as NCM is aware, the ESAs are the only advertising services agreements of their kind in the world. ROA.15768:15-21.

Additionally, the 2007 ESAs restructured the payments to AMC, Cinemark, and Regal from a revenue-share structure to a theater-access-fee structure, in which the chains receive payments from NCM based on the number of screens and theater patrons to which NCM provides advertising. ROA.15184. To further align the parties' interests, the ESAs also required that any new AMC, Cinemark, or Regal theater not already under contract to another advertising services company use NCM's services. *Id.* In return, AMC, Cinemark, and Regal would receive additional membership units in NCM (the "Common Units") for increases in attendance. *Id.*

---

[1] In September 2019, the terms of the Regal and Cinemark ESAs were again extended. ROA.15185-86. The average remaining term of the AMC and Cinemark ESAs is now 15 years. *See id.*

Each ESA has a substantially similar MFN Clause that allows each of AMC and Cinemark to amend its own ESA to reflect amendments made to another ESA.  The MFN Clauses provide in relevant part:

> [NCM] shall promptly provide to AMC [or Cinemark] a copy of ***each agreement, amendment or extension*** as may be entered into by [NCM] on or after the Original Effective Date ***with each Founding Member which amends any term of the Exhibitor Services Agreement entered into with any of the Founding Members***, as such may be amended from time to time. . . . Such copies shall be redlined to reflect all differences between such agreements or amendments and this Agreement or corresponding amendment.

ROA.15157-58 (emphases added); *see also* ROA.15082.

The ESAs are governed by Delaware law.   ROA.14986; ROA.15088; ROA.15163.

## III.  THE JV AGREEMENTS ESTABLISHED AN INTEGRATED ECONOMIC AND GOVERNANCE ARRANGEMENT FOR "FOUNDING MEMBERS."

As part of the 2007 Transaction, the parties also entered into or amended several additional, integrated agreements on the same day as the restructured ESAs, including the:  (i) Third Amended and Restated Limited Liability Operating Agreement (as amended, modified, or supplemented, the "LLC Agreement"), (ii) Common Unit Adjustment Agreement (the "CUAA"), and (iii) Tax Receivable Agreement (together with the LLC Agreement, the

CUAA, the ESAs, and various other agreements executed as part of the formation of the NCM joint venture and the 2007 Transaction, the "JV Agreements"). Collectively, the JV Agreements reflected the integrated economic and governance arrangement among NCM, NCM, Inc., AMC, Cinemark, and Regal put in place through the 2007 Transaction.

Historically, each of AMC, Cinemark, and Regal had governance rights over NCM under the JV Agreements as a "Founding Member," such as certain veto and director designation rights, so long as it owned at least 5% of the Common Units in NCM (the "Ownership Threshold"). ROA.15456-57. If AMC, Cinemark, or Regal dropped below the Ownership Threshold, it would permanently lose these rights. *Id.* Further, the LLC Agreement specifies that the theater chains would lose "Founding Member" status entirely if they redeemed all of their Common Units. ROA.15436 (providing that a Founding Member "shall no longer be treated as a Founding Member under this Agreement" where that Founding Member "cease[s] to own Common Units").

Before NCM's bankruptcy filing, Regal redeemed all of its Common Units in NCM and thus ceased being a "Founding Member" of NCM. ROA.15190-91. Pursuant to the Termination and Settlement Agreement between Regal and NCM (discussed further below), in June 2023,

12

Regal terminated its rights and interests under all JV Agreements (including the LLC Agreement) and forfeited all rights and interests in subsequently issued Common Units, and thus ceased being a "Member" of NCM altogether.  ROA.16545-49; ROA.15586-90.

## IV.  THE ESAS ARE MATERIALLY DIFFERENT FROM NCM'S NETWORK AFFILIATE AGREEMENTS WITH REGIONAL THEATERS.

As discussed above, apart from the ESAs, NCM has numerous separate advertising arrangements with regional Network Affiliates (the "Network Affiliate Agreements"), on which the NATA was based.  While the ESAs are substantively identical to each other and are part of an integrated set of agreements governing the joint venture, Network Affiliate Agreements are stand-alone agreements with individual counterparties that bear no relationship to the founding, governance, or operations of the NCM joint venture.  ROA.15222.

The Network Affiliate Agreements do not provide Network Affiliates with governance rights in NCM or NCM, Inc., or tax benefits, as provided under the JV Agreements.  ROA.15221-24.  Additionally, while the ESAs are long-term agreements—the AMC ESA expires in 2037 and the Cinemark ESA

13

expires in 2041—Network Affiliate Agreements generally last only five to 10 years. ROA.15223.

And while the JV Agreements provided that NCM would compensate AMC, Cinemark, and Regal largely through equity, Network Affiliates are *not* compensated via equity. ROA.15188-89; ROA.15222-23. Rather, Network Affiliate Agreements typically provide for a fixed minimum fee based on screen numbers or a minimum per-attendee revenue guarantee. *Id.*

## V.     AS PART OF THEIR EQUITY COMPENSATION, AFTER MEETING CUAA REQUIREMENTS, AMC, CINEMARK, AND REGAL COULD EXCHANGE COMMON UNITS FOR STOCK.

Under NCM's "Up-C" Structure, shares of NCM, Inc. are publicly traded, while NCM's capital structure changes depending on AMC's and Cinemark's theater attendance. In particular, the CUAA provides for the adjustment of Common Units corresponding to increases or decreases in attendance. ROA.15321. Under the CUAA, within 90 days after NCM's fiscal year ends, NCM must provide each of AMC and Cinemark a determination notice of the adjustment of the Common Units and, as needed, issue any additional units 10 business days thereafter. ROA.15322.

On March 29, 2023, NCM timely issued a determination notice to AMC, indicating that pursuant to the CUAA, NCM was to issue 16,581,829 Common

Units (the "CUAA Units"). ROA.15424. NCM filed its chapter 11 petition (discussed below) on April 11, 2023, one day before the deadline for issuing the CUAA Units, and was thereafter protected by the Bankruptcy Code's automatic stay.

After the CUAA Units are issued, the LLC Agreement provides AMC and Cinemark with an elective redemption right (the "Redemption Right") to exchange Common Units for (a) shares of NCM, Inc. common stock on a one-for-one basis; or (b) at NCM, Inc.'s option, a cash payment equal to the market price of one share of NCM, Inc.'s common stock. ROA.16531-33. To exercise its Redemption Right, AMC or Cinemark must provide written notice to NCM specifying the number of Common Units it wishes to redeem and provide a date of redemption of not less than three business days and not more than 10 business days following the notice.[2] ROA.16531-32. Until the requisite notice period is met, NCM has no contractual obligation to redeem the Common Units.

---

[2]    The District Court noted an apparent discrepancy between NCM's brief below and the LLC Agreement, in which NCM stated the redemption date must be provided at least three days following notice, while the LLC Agreement required at least seven days. ROA.16767. The District Court was referring to an earlier draft of the LLC Agreement. A subsequent amendment provides the minimum three-day period described herein. ROA.16531-32.

## VI. THE PRESSURES OF THE COVID-19 PANDEMIC CAUSED BOTH REGAL AND NCM TO PURSUE RESTRUCTURING.

The COVID-19 pandemic had a significant negative impact on the movie theater industry.

In September 2022, Regal, together with its ultimate parent and certain of its affiliates, filed for chapter 11 protection in *In re Cineworld Group plc, et al.*, No. 4:22-bk-90168 (MI) (Bankr. S.D. Tex. 2022), and sought to reject its ESA as part of that process. Like AMC and Cinemark, Regal is an important element of NCM's advertising network, contributing approximately 30% of NCM's screens and theaters. ROA.14916-17. Accordingly, when Regal sought to reject its ESA, NCM vigorously opposed. ROA.14886-87.

NCM began pursuing its own restructuring a few months later. NCM initiated arm's-length, good-faith discussions with NCM, Inc. and an ad hoc group of its secured lenders and unsecured noteholders that collectively held over 66.67% of NCM's pre-petition secured debt. ROA.15207. NCM's primary goal was to restructure its balance sheet while maintaining its Up-C Structure to preserve its ability to perform under the JV Agreements, including the ESAs. *Id.*

On April 11, 2023, NCM, NCM, Inc., and the ad hoc group entered into a restructuring support agreement, under which the ad hoc group and NCM,

Inc. agreed to support NCM's chapter 11 plan of reorganization. ROA.14827-73; ROA.15207-08. Also on April 11, NCM filed a petition for protection in the U.S. Bankruptcy Court for the Southern District of Texas under chapter 11 of title 11 of the United States Code. *See In re Nat'l CineMedia, LLC*, No. 4:23-bk-90291 (MI) (Bankr. S.D. Tex. 2023) (the "Bankruptcy Case").

## VII. AFTER EXTENSIVE NEGOTIATIONS, NCM REACHED A SETTLEMENT WITH REGAL, WHICH THE BANKRUPTCY COURT APPROVED.

While Regal's bankruptcy was ongoing, NCM—understanding the risks of Regal rejecting its ESA—continued negotiations with Regal. Shortly after NCM filed for bankruptcy, the parties agreed to engage in mediation before the Honorable Christopher Lopez. ROA.14918.

As a result of arm's-length negotiations overseen by Judge Lopez, the parties reached a settlement-in-principle on May 5, 2023, which provided:

- First, Regal would exit the NCM joint venture by terminating the Regal ESA and Regal's rights and interests under the JV Agreements, ROA.16541-56 (the "Termination and Settlement Agreement," and together with the NATA, the "Regal Agreements"); and

- Second, Regal and NCM would enter into the NATA, a new advertising services agreement based on NCM's Network Affiliate Agreements with its regional network partners. ROA.15329-64.

NCM moved for approval to enter into the Regal Agreements, ROA.14875-913, and AMC and Cinemark each filed objections. AMC and Cinemark argued before the Bankruptcy Court that NCM's entry into the NATA triggered the MFN Clauses because it was "an agreement" that amended the terms of the Regal ESA, despite the termination of the Regal ESA. ROA.15252-54; ROA.15281-84. This is the same basic argument that AMC and Cinemark twice reprised unsuccessfully in the District Court and now are making for the second time before this Court, following the denial of their motion to stay.

Based on the evidentiary record, and following a hearing, the Bankruptcy Court overruled AMC's and Cinemark's objections, authorized NCM's entry into the Regal Agreements, and approved the settlements thereunder (the "Regal Approval Order"). ROA.15584-91. In so holding, the Bankruptcy Court found and concluded:

- NCM and Regal terminated the Regal ESA before entering into the NATA. ROA.15586-88; ROA.15851:22-23;

- The NATA does not amend any term of the Regal ESA and therefore does not trigger the MFN Clauses because an agreement that no longer exists cannot be amended. ROA.15587, 15589; ROA.15742-43;

- The MFN Clauses also were not triggered by the NATA because it is a "different agreement" with a "different set of rights," and

"[i]t does not contain a lot of the benefits that" were included "in the original agreements." ROA.15852:4-10; ROA.15587; *see also* ROA.15768:11-14;

- The NATA "reflects a fundamentally different relationship between Regal and [NCM]," and "is not contingent upon or related to the Regal ESA." ROA.15587; ROA.15851:24-52:10;

- It would not have been in NCM's best interests to enter into the NATA if doing so would trigger the MFN Clauses under the AMC or Cinemark ESAs, and NCM was prepared to walk away from the Regal Agreements if the court found that the MFN Clauses were triggered. ROA.15586; ROA.15771-72; *see also* ROA.14920-21;

- If the MFN Clauses were triggered, NCM would struggle to remain cash flow positive and risk liquidation. ROA.14920-21; ROA.15586; ROA.15771-72;

- The NATA was the result of NCM exercising its business judgment to maximize the value of its bankruptcy estate, and the product of changed circumstances of two counterparties in bankruptcy. ROA.15586; ROA.15828:22-29:5, 15851:11-16, 15853:11-21;

- The ESAs and the other JV Agreements form an "integrated set of documents" from an "integrated transaction." ROA.15836:17-20;

- As Regal redeemed all of its Common Units in NCM before the Petition Date, Regal was not a "Founding Member" under the LLC Agreement when it entered into the NATA. ROA.15587, 15589-90; ROA.15836:21-37:1; and

- Regal was not a "Founding Member" for purposes of the MFN Clauses because it had released all rights and interests under the JV Agreements and "the relationship between Regal and [NCM]" had "been fundamentally altered as a result of the changed circumstances and bankruptcy proceedings of Regal and [NCM]." ROA.15587-88.

The Regal Agreements became effective on July 14, 2023.  ROA.15675-76.

## VIII. THE BANKRUPTCY COURT CONFIRMED THE PLAN AFTER CAREFULLY CONSIDERING AMC'S AND CINEMARK'S OBJECTIONS.

Over the course of two-and-a-half months, NCM negotiated the terms of its Modified First Amended Plan of Reorganization of National CineMedia, LLC Pursuant to Chapter 11 of the Bankruptcy Code (as amended, supplemented, and modified, the "Plan"), ROA.15525-82, and built consensus across all major constituencies, including the ad hoc group, NCM, Inc., and the Official Committee of Unsecured Creditors.

AMC and Cinemark each filed objections to the Plan.  Among other things, AMC and Cinemark argued that pursuant to section 365 of the Bankruptcy Code, NCM could not assume their ESAs and cure the defaults under the agreements without permitting them to exercise their purported rights under the MFN Clauses—which, per the Regal Approval Order, the Bankruptcy Court already had resolved were not implicated.  ROA.15236-37; ROA.15303-04.  AMC also argued that NCM was required to issue the CUAA Units and that AMC had the right to redeem those units into shares of NCM, Inc. common stock before the equity was cancelled under the Plan. ROA.15238-39.

On June 26, 2023, the Bankruptcy Court held a confirmation hearing and found:

- AMC could have approached the Bankruptcy Court seeking to compel the issuance of the CUAA Units at any time before the confirmation hearing, but failed to do so. ROA.15934:14-17, 15937:7-13;

- AMC failed to provide any valid grounds to object to the timing of the issuance and cancellation of the CUAA Units on the Effective Date. ROA.15909:12-16, 15930:21-24; and

- Because the CUAA Units would properly be issued shortly before the Effective Date and then cancelled as part of the Plan, AMC did not have Common Units eligible for redemption under the LLC Agreement. Nevertheless, AMC continued to maintain redemption rights under the LLC Agreement for subsequently issued Common Units. ROA.15908:12-18, 15931:12-14.

On June 27, 2023, the Bankruptcy Court overruled AMC's and Cinemark's objections and confirmed the Plan (the "Confirmation Order"). ROA.15593-655. The Confirmation Order provided that NCM could assume all executory contracts, including the JV Agreements and ESAs, and pay any undisputed portion of cure claims on "the Effective Date or as soon as reasonably practicable thereafter." ROA.15615-16, 15625, 15642-43. Further, the Confirmation Order provided that NCM would issue the CUAA Units to AMC on or immediately before the Effective Date, consistent with its obligations under the CUAA. ROA.15626.

21

## IX. NCM'S CONSUMMATED CHAPTER 11 PLAN INVOLVES SEVERAL INTEGRATED, COMPLEX TRANSACTIONS.

The Plan contemplates a series of integrated, complex transactions, including the following:

(i) a direct exchange of secured debt for equity in NCM, Inc.;

(ii) approval of a settlement with NCM, Inc. to preserve the Up-C Structure on and after the Effective Date, make a $15 million capital contribution to NCM, and make a $500,000 contribution to the creditors' committee settlement;

(iii) approval of a settlement with the creditors' committee for holders of General Unsecured Claims to share in their pro rata share of a $15 million cash pool;

(iv) certain structuring and tax steps, including the distribution of NCM, Inc. common stock, ROA.15552-53;

(v) a shareholder vote at NCM, Inc. to facilitate these transactions, including a reverse stock split followed by the issuance of approximately 80 million shares of NCM, Inc. common stock to secured lenders;

(vi) a $55 million exit facility secured by nearly all of the reorganized NCM's assets to provide liquidity to fund operations at emergence;

(vii) the cancellation of all of NCM's existing equity;

(viii) the cancellation and release of all pre-petition liens on NCM's property; and

(ix) the assumption of all unexpired contracts and leases that had not been previously rejected or assumed, and the cure of any defaults on the Effective Date (collectively, among various other transactions and along

with the settlements, the "Restructuring Transactions"). ROA.15550-59; Bankr. Case, No. 4:23-bk-90291, ECF No. 555, Ex. B at 2.[3]

On August 7, 2023, NCM satisfied all conditions precedent to consummation of the Plan, including by curing all then-existing defaults under executory contracts that NCM sought to assume. ROA.15560-61; Bankr. Case, No. 4:23-bk-90291, ECF No. 554. At the same time that it cured defaults to every other counterparty, NCM issued the CUAA Units to AMC to cure the default under the CUAA. *Id.* The Plan became effective on the same day (the "Effective Date"), now more than 15 months ago. *Id.*

## X. FOLLOWING CONFIRMATION, NCM, NCM, INC., AND NUMEROUS THIRD PARTIES CONSUMMATED THE RESTRUCTURING TRANSACTIONS.

Following the Bankruptcy Court's and the District Court's denials of AMC and Cinemark's motions to stay the Bankruptcy Court's orders, on

---

[3]   *See* Nat'l CineMedia, Inc., National CineMedia, LLC Announcing Reverse Stock Split (Form 8-K Ex. 99.1) (Aug. 3, 2023), https://www.sec.gov/Archives/edgar/data/1377630/000137763023000116/ncmllc-20230802.htm.

The Court may take judicial notice of the facts in NCM's public filings. *See, e.g., MidCap Media Fin., LLC* v. *Pathway Data, Inc.*, 929 F.3d 310, 315 (5th Cir. 2019) (this Court has taken judicial notice of "facts 'not subject to reasonable dispute' from certain sources such as public filings" (quoting Fed. R. Evid. 201)); *Basic Cap. Mgmt., Inc.* v. *Dynex Cap., Inc.*, 976 F.3d 585, 589 (5th Cir. 2020) (affirming decision to take judicial notice of SEC Form 10-K filing).

August 7, 2023, NCM filed and served the Notice of Effective Date, and the Plan and the Restructuring Transactions were consummated. *Id.*

Since the Effective Date, NCM has completed distributions to holders of General Unsecured Convenience Claims and Secured Debt Claims. Bankr. Case, No. 4:23-bk-90291, ECF No. 609 at 11. Further, NCM substantially completed the pro rata distribution of the General Unsecured Claim Cash Pool to holders of General Unsecured Claims. *Id.* Additionally, since the NATA became effective on July 14, 2023, NCM and Regal have been performing under the agreement. ROA.15675-76.

## XI. THE PARTIES, AND CONSTITUENTS NOT BEFORE THIS COURT, HAVE RELIED ON THE BANKRUPTCY COURT'S ORDERS.

Several stakeholders critical to NCM's operations have relied on the entry of the Confirmation Order and Regal Approval Order. Specifically, the Bankruptcy Court entered these orders ahead of the "upfront" selling season, during which NCM sells its inventory to advertisers for the next 12 months. ROA.16520-21. After entry of these orders, NCM assured potential advertisers that NCM would continue to place advertisements in Regal's theaters and to operate the largest theater advertising network in North America. *Id.*

Reversing the Confirmation Order or Regal Approval Order after NCM pitched advertisers on the understanding that it would keep Regal in its network would likely cause potential advertisers to lose confidence in NCM. ROA.16521. Moreover, consistent with the Bankruptcy Court's finding that it would not have been in NCM's best interests to enter into the NATA if doing so would have triggered the MFN clauses, ROA.15586; ROA.15771-72, the aggregate potential loss of gross revenue attributable to the termination of the NATA if AMC and Cinemark are granted their requested relief could be more than $1 billion. ROA.16521.

Additionally, the consummation of the Restructuring Transactions also allowed NCM, Inc. to meet the criteria to continue listing its stock on Nasdaq, which is an integral part of preserving the Up-C Structure and NCM's business operations.[4] ROA.16524.

## XII.  PROCEDURAL HISTORY

Despite their arguments being rejected by every court to hear them, including this Court, AMC and Cinemark have persisted in their attempts to undo NCM's successful restructuring.

---

[4]  Nat'l CineMedia, Inc., Other Events (Form 8-K) (Aug. 24, 2023), https://www.sec.gov/ix?doc=/Archives/edgar/data/1377630/000137763023000161/ncmllc-20230823.htm.

On June 29, 2023, AMC and Cinemark appealed the Confirmation Order to the U.S. District Court for the Southern District of Texas, ROA.15657-64, and a week later, they appealed the Regal Approval Order, ROA.15666-73. The appeals were consolidated.

On July 6, 2023, AMC and Cinemark moved on an emergency basis in the Bankruptcy Court to stay the Regal Approval Order and the Confirmation Order pending appeal. ROA.16357-84. Following briefing and oral argument, on July 21, 2023, the Bankruptcy Court denied AMC and Cinemark's motion to stay, finding that they had failed to demonstrate a likelihood of success on appeal. ROA.16527-29.

AMC and Cinemark filed a second emergency stay motion in the District Court on July 24, 2023. ROA.23-908. The District Court temporarily stayed the Confirmation Order and consummation of the Plan while considering the stay motion. ROA.1052. On August 4, 2023, the District Court denied the stay motion, finding that AMC and Cinemark had failed to show a likelihood of success on appeal or irreparable harm, and dissolved its temporary stay. ROA.1087-92, 1094.

On August 7, 2023—the Effective Date—AMC and Cinemark asked this Court to stay the Bankruptcy Court's orders. 5th Cir. Stay Case, No. 23-

20367, ECF No. 5. This Court denied the motion, determining that it lacked jurisdiction under 28 U.S.C. § 158(d) and that AMC and Cinemark had failed to meet their burden to obtain a writ of mandamus. *Id.* at ECF No. 26-2 at 3. The Court further stated that, with respect to the stay factors, AMC and Cinemark "fail to show a likelihood of success, or irreparable harm." *Id.*

The parties proceeded to brief the issues in the District Court, and NCM moved to dismiss the appeal as equitably moot. On August 13, 2024, the District Court affirmed the Confirmation Order and Regal Approval Order, and found that the factual record "overwhelmingly supports" that the MFN Clauses were not triggered upon the termination of the Regal ESA and entry into the NATA. ROA.16762.

The District Court further found that AMC had failed to seek the issuance of the CUAA Units at any time before the Bankruptcy Court's consideration of whether to confirm the Plan, and that no authority supports AMC's position that it was entitled to the early issuance of the CUAA Units or that they should not have been cancelled with existing equity interests. ROA.16767-68. Because it had affirmed the Bankruptcy Court's rulings on the merits, the District Court denied as moot NCM's motion to dismiss for equitable mootness. ROA.16770. AMC and Cinemark timely appealed.

## SUMMARY OF ARGUMENT

I. As the District Court affirmed, the Bankruptcy Court did not err, let alone abuse its discretion, in concluding in the Regal Approval Order that the NATA between Regal and NCM did not trigger the MFN Clauses in AMC's and Cinemark's ESAs. By their plain language, the MFN Clauses are triggered only by an "agreement, amendment or extension . . . which amends any term of" an ESA. ROA.15157-58. The NATA did not amend—and could not have amended—the Regal ESA (or any of its terms) because the Regal ESA was terminated and ceased to exist before the NATA was executed. "Under Delaware law, the 'thing' (contract) being amended must continue to exist in order for an agreement to constitute an amendment." ROA.1087 (citing *S'holder Representative Sers., LLC*, 2023 WL 3092895, at *5).

Further, as both the Bankruptcy Court and District Court have recognized based on the unrebutted record, the Regal ESA and the NATA are "radically different" agreements. ROA.16762. Even ignoring that the NATA could not have amended the non-existent Regal ESA, the MFN Clauses provide no mechanism for AMC and Cinemark to claim entitlement to an entirely different agreement just because they prefer its terms. AMC and Cinemark should not be permitted to use the Regal and NCM bankruptcies to

28

seek a windfall in which they keep hundreds of millions in upfront payments from the 2007 Transaction while abandoning the contractual bargain they struck in exchange and avoiding the burdens of filing for bankruptcy themselves.

Additionally, the Bankruptcy Court's determination regarding the MFN Clauses should be affirmed on the independent ground that the NATA is not an agreement with a Founding Member, as Regal held no Common Units in NCM and had relinquished all rights under the JV Agreements before executing that agreement.

II. Because the MFN Clauses were not triggered by the execution of the NATA and NCM cured all applicable defaults under the ESAs, NCM satisfied all relevant requirements under section 365 of the Bankruptcy Code to assume the AMC and Cinemark ESAs and other JV Agreements on the Effective Date.

AMC also now argues (not joined by Cinemark, although it also received CUAA Units that were cancelled) that NCM could not have assumed the ESAs and other JV Agreements because NCM did not issue the CUAA Units to AMC in time for AMC to exercise its Redemption Right under the LLC Agreement. This Court should find that AMC waived this argument by failing

to timely raise it below. The argument also fails on the merits. AMC's Redemption Right was not exercisable on the Effective Date under the LLC Agreement's plain terms, which required AMC to give notice before it could redeem. There was accordingly no default preventing the assumption of the ESAs and other JV Agreements. NCM already had cured the non-issuance of the CUAA Units pursuant to the CUAA by issuing the CUAA Units immediately before the Effective Date, and AMC identifies no authority suggesting that NCM needed to do so sooner.

III. Finally, this Court should decline to entertain AMC and Cinemark's requests for it to upturn NCM's substantially consummated Plan almost a year and a half after the Effective Date under the doctrine of equitable mootness. *See, e.g., In re Manges*, 29 F.3d 1034, 1039 (5th Cir. 1994). Where, as here, no stay has been obtained, the Plan has been substantially consummated, and the requested relief would harm the rights of third parties not before the Court or impair the success of the Plan, this Court can and should dismiss the appeal to protect the bankruptcy process and the finality it requires.

## STANDARD OF REVIEW

*First*, AMC and Cinemark challenge various factual findings and legal conclusions made by the Bankruptcy Court (and later affirmed by the District Court) in the Regal Approval Order, which approved NCM's entry into the Regal Agreements and the settlements thereunder pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure. Settlements or compromise orders under Bankruptcy Rule 9019 are reviewed for abuse of discretion. *In re Moore*, 608 F.3d 253, 257 (5th Cir. 2010).

"A bankruptcy court does not abuse its discretion unless its ruling is based on an erroneous review of the law or on a clearly erroneous assessment of the evidence." *In re Yorkshire LLC*, 540 F.3d 328, 331 (5th Cir. 2008) (quotation and citation omitted). A finding is clearly erroneous only if, based on the entirety of the evidence, the reviewing court is left "with the definite and firm conviction that a mistake has been committed." *In re Dennis*, 330 F.3d 696, 701 (5th Cir. 2003) (citation omitted).

*Second*, the Bankruptcy Court's affirmed legal conclusions concerning the issuance and cancellation of the CUAA Units should be reviewed *de novo*. *In re Galaz*, 841 F.3d 316, 321 (5th Cir. 2016) (circuit court reviewing district court's affirmance of bankruptcy court orders "applies the same standard of

review to the bankruptcy court decision that the district court applied"—

reviewing "findings of fact for clear error and legal conclusions *de novo*"

(quotation and citation omitted)).

## ARGUMENT

## I. THE DISTRICT COURT CORRECTLY AFFIRMED THE BANKRUPTCY COURT'S HOLDING THAT THE NEW REGAL AGREEMENT DID NOT TRIGGER THE MFN CLAUSES.

### A. The NATA Could Not and Did Not Amend the Regal ESA, Which Was Terminated Before the New Agreement Was Entered.

Under their plain language, the MFN Clauses can be triggered only by

an "agreement, amendment or extension" that is entered into by NCM and a

"Founding Member which *amends any term of the [ESA]* entered into with

any of the Founding Members." ROA.15157-58 (emphasis added). The first

question for this Court is whether the Bankruptcy Court and District Court

correctly concluded that the NATA does not "amend[] any term of the" Regal

ESA.

They did. As the Bankruptcy Court and District Court correctly

recognized, the NATA "was a new deal entirely" and "NCM did not factually

amend the Regal-NCM ESA," as required to trigger the MFN Clauses,

because "[t]hat contract was rejected by Regal in its own bankruptcy" and

terminated. ROA.16762. Under basic principles of contract law, an agreement that has been terminated and no longer exists cannot be amended, nor can any of its terms. That reality forecloses AMC and Cinemark's argument.

Indeed, as the District Court explained in denying AMC and Cinemark's stay motion, and then reaffirmed in substance in affirming the Bankruptcy Court's orders, "[u]nder Delaware law, the 'thing' (contract) being amended must continue to exist in order for an agreement to constitute an amendment." ROA.1087.

In *Shareholder Representative Services, LLC*, the Delaware Court of Chancery explained that "[a]n amendment is an agreement made subsequent to an existing agreement ***which alters or adds to the existing agreement***." 2023 WL 3092895, at *5 (emphasis added). "[T]he key feature of an amendment is that it makes changes to an existing agreement." *Id.* Here, the NATA could not and did not make any changes to an existing agreement (the Regal ESA) because it was entered into after the ESA was terminated.

AMC and Cinemark identify no law to the contrary. Instead, they try to avoid this inescapable conclusion by arguing that the Delaware court did not address "circumstance[s] where a new 'agreement' amends 'the terms' of the prior one." Opening Br. 32. But those circumstances are impossible where

the prior agreement has been terminated: Delaware law is clear that "by definition, an amendment requires [] ***the thing being amended to continue to exist***." *S'holder Representative Servs.*, 2023 WL 3092895, at *5 (emphasis added). Whether the amendment is styled as such or as a new agreement matters not—contract terms that do not exist cannot be amended. And AMC and Cinemark nowhere dispute that the Regal ESA was terminated before the NATA was executed. *See* Opening Br. 18 n.10 (admitting that "no one disputes the underlying facts").

Other courts have recognized this same basic principle explained by the Delaware Court of Chancery. Relying on commonly accepted dictionaries, a court in this Circuit determined that the verb "amend" and the noun "amendment" "requir[e] the continued existence of the thing amended." *In re Black*, 225 B.R. 610, 618-19 (Bankr. M.D. La. 1998).

Additionally, in *J.C.B. Sales Ltd.* v. *Wallenius Lines*, in considering the common meaning of the word "amendment," the Second Circuit cited authority explaining that "an amendment is something which incorporates by reference some or all of a previously filed document," and that the word "amendment" by its "very definition connotes alteration, improvement or correction, and thus negates the idea of destruction or elimination of the

original." 124 F.3d 132, 136 (2d Cir. 1997) (first quoting *People* v. *Sarver*, 429 N.E.2d 1108, 1109 (Ill. Ct. App. 1981), and then quoting *Greenville Cmty. Hotel Corp.* v. *Alexander Smith, Inc.*, 95 S.E.2d 262, 265 (S.C. 1956)).

Consistent with these cases, and as AMC and Cinemark acknowledge, "[u]nder well-settled case law, Delaware courts look to dictionaries for assistance in determining the plain meaning of terms which are not defined in a contract." *Lorillard Tobacco Co.* v. *Am. Legacy Found.*, 903 A.2d 728, 738 (Del. 2006); *see* Opening Br. 25. Dictionary definitions make clear that terms must exist to be amended.

For instance, the Oxford English Dictionary defines "amend" as to "make minor changes in (a text) in order to make it fairer, more accurate, or more up-to-date." *Amend, Oxford English Dictionary* (Nov. 2024 online ed.). Black's Law Dictionary likewise defines "amend" to mean "[t]o correct or make usu[ally] small changes to (something written or spoken)" or "[t]o change the wording of; specif[ically], to formally alter (a statute, constitution, motion, etc.) by striking out, inserting or substituting words." *Amend, Black's Law Dictionary* (12th ed. 2024). These definitions presuppose existing terms to which minor alterations are made. Parties cannot (and here, did not) "amend" the terms of a contract that no longer exists.

AMC and Cinemark ultimately ask this Court to read the requirement that an "agreement, amendment or extension" triggering the MFN Clauses must "***amend[] [a] term of the [ESA]***" out of the provisions. ROA.15158 (emphasis added). But, as AMC and Cinemark concede, courts cannot interpret contractual language to render a clause meaningless. Opening Br. 25 (arguing that "contracts must be interpreted to 'give each provision and term effect'" (quoting *Osborn ex rel. Osborn* v. *Kemp*, 991 A.2d 1153, 1159 (Del. 2010)).

While AMC and Cinemark might prefer that the MFN Clauses be triggered by any new advertising agreement, that is not what the ESAs provide. And it is black letter law that "courts will not rewrite contractual language covering particular topics just because one party failed to extract as complete a range of protections as it, after the fact, claims to have desired during the negotiations process." *In re IAC/Interactive Corp.*, 948 A.2d 471, 506 n.166 (Del. Ch. 2008) (quotation and citation omitted); *see also Nemec* v. *Shrader*, 991 A.2d 1120, 1126 (Del. 2010) (Delaware courts will "not rewrite the contract to appease a party who later wishes to rewrite a contract [it] now believes to have been a bad deal.").

36

Had the parties intended for the MFN Clauses to capture *any* new advertising agreements, they could have drafted the MFN Clauses that way. It was no secret that such post-ESA termination agreements could arise. The Bankruptcy Court correctly found that the parties had termination rights under their respective ESAs and therefore contemplated that any "Founding Member" could potentially terminate its ESA while the other "Founding Members" remained bound to theirs. ROA.15846:19-23; ROA.14974.

And other provisions of the ESAs illustrate that the parties knew how to capture post-termination agreements when they intended to do so. For example, the definition of "Beverage Agreement" expressly covers, in addition to amendments to the existing agreement, "any subsequent agreements entered into by [the ESA counterparty] and its beverage concessionaires at the expiration or termination of the [existing] agreement." ROA.15012. The absence of such language in the MFN Clauses reflects a considered choice by the parties directly contrary to AMC and Cinemark's claimed interpretation. *See RCM LS II, LLC* v. *Lincoln Circle Assocs., LLC*, 2014 WL 3706618, at *8 (Del. Ch. July 28, 2014) (rejecting interpretation of contract that ignored that parties had used other language to convey the defendant's urged meaning and thus "knew how to refer to [that concept] when they wanted to"); *Union Oil*

37

*Co. of Cal.* v. *Mobil Pipeline Co.*, 2006 WL 3770834, at *12 (Del. Ch. Dec. 15, 2006) ("Delaware law will not create contract rights and obligations that were not part of the original bargain, especially where, as here, the contract could easily have been drafted to expressly provide for them.").

Contrary to AMC and Cinemark's argument, the Bankruptcy Court's and District Court's correct reading of the MFN Clauses does not render the terms "agreement" and "any term" surplusage in the provision's reference to an "agreement, amendment or extension" that "amends any term of" an ESA. Opening Br. 30-31. Amending terms of an existing ESA may be effectuated through various instruments, including an agreement, amendment, or extension. No matter its form, the "agreement, amendment or extension" still has to amend at least one term of an ESA—thereby requiring that the underlying ESA continue to exist.

**B.  The Regal ESA and the NATA Create Fundamentally Different Contractual Frameworks, Further Establishing There Was No Amendment to the Terms of the ESA.**

As the Bankruptcy Court and District Court appropriately found, the NATA that Regal and NCM executed "is a radically different agreement" than the Regal ESA. ROA.16762. Even ignoring the fatal flaw in AMC and Cinemark's position that the NATA could not have amended non-existent

38

terms, that agreement cannot be fairly characterized as an "amendment" of the ESA at all. The differences between the Regal ESA and NATA are not "minor" or "small" changes, *see supra* p. 34-35 (discussing definitions of "amend"), but rather reflective of "a new deal entirely." ROA.16762.

That is because the ESA and NATA serve fundamentally different functions. As discussed above, the Regal ESA was part of an integrated set of JV Agreements that prescribed the economic and governance arrangement among NCM, NCM, Inc., AMC, Cinemark, and Regal. These integrated agreements included (i) the LLC Agreement, through which the parties had certain governance rights and the Redemption Right; (ii) the CUAA, through which AMC, Cinemark, and Regal agreed to an annual adjustment of Common Units based on changes in patron attendance; and (iii) the Tax Receivable Agreement, through which the theater chains received cash from NCM, Inc. for a portion of the tax benefits that NCM, Inc. received. When the Regal ESA was terminated, Regal left the joint venture, forfeited its rights, and mutually released all claims under the integrated set of JV Agreements. *See* ROA.16758.

The new NATA with Regal is a stand-alone agreement based on Network Affiliate Agreements that NCM enters into with unaffiliated

theaters. These agreements are negotiated "on a case-by-case basis," and they "differ from the ESAs in their payment structures and terms." ROA.15222. For example:

- The ESAs and other JV Agreements provided "multi-faceted" consideration, including significant upfront payments, "equity compensation, tax benefits, Theater Access Fees, and certain governance rights," but the consideration granted to Regal under the NATA is limited to payments under a revenue share formula. ROA.15222; ROA.15344-47.

- The ESAs provide for a broad scope of exclusive advertising and promotional services, including various on-screen advertising; advertising in connection with events; lobby promotions; and advertising related to certain beverage agreements. ROA.14952-68, 14990-94; ROA.15010-18. In contrast, the NATA provides for a limited scope of exclusive on-screen advertising at certain intervals before or after showtime and does not include off-screen, lobby advertising, for which Regal can contract with other advertising providers. ROA.15333-35.

- The Regal ESA established a term of 34 years, but the NATA term lasts only 10 years. ROA.15018; ROA.15354.

Where, as here, a new agreement covering similar subject matter to a prior agreement contains materially different terms, it should be treated as abrogating, rather than amending, the original agreement. *See, e.g.*, *Seaford Assocs. Ltd. P'ship* v. *Subway Real Estate Corp.*, 2003 WL 21254847, at *7 (Del. Ch. May 21, 2003) (considering document titled "Lease Amendment and Extension" as a new lease because it contained substantive changes).

40

### C. Regal Negotiated a New Agreement Because of Its Bankruptcy, and AMC and Cinemark May Not Take Advantage to Renegotiate Their Own Deals.

The MFN Clauses cannot be triggered merely because AMC and Cinemark favor the NATA's terms over those of their ESAs. AMC and Cinemark complain that they "remain tied to the terms of their current, long-term ESAs" and "will no longer be protected against future agreements or amendments between NCM and Regal that may provide even more favorable terms for Regal." Opening Br. 36. These are business consequences rather than legal arguments, and AMC and Cinemark's disappointment cannot turn the MFN Clauses into a catch-all renegotiation provision. *See In re IAC/Interactive Corp.*, 948 A.2d at 506 n.166. As the District Court explained in denying AMC and Cinemark's stay motion, "the fact that Regal was able to improve its situation might seem inequitable," but "that is sometimes the result in a bankruptcy situation." ROA.1087.

Further, although AMC and Cinemark assert that their interpretation of the MFN Clauses reflects "one of the central premises of the parties' creation of NCM," Opening Br. 37, they have never cited any evidence of that. Any such intent evidence would be irrelevant anyway given that unambiguous contractual language, like that in the MFN Clauses, is interpreted "without

resort to extrinsic evidence." *Sunline Com. Carriers, Inc.* v. *CITGO Petrol. Corp.*, 206 A.3d 836, 846 (Del. 2019) (citation omitted); *see also* Opening Br. 24.

AMC and Cinemark's desired outcome would grant them a windfall resulting from Regal's and NCM's bankruptcies, while allowing them to avoid the consequences of filing for bankruptcy themselves. *See* ROA.15585-86, 15589. Their unwillingness to file for bankruptcy is accordingly not "irrelevant" as AMC and Cinemark claim, Opening Br. 36, but what separates them from Regal, whose bankruptcy enabled it to terminate its ESA and secure the NATA.

As the Bankruptcy Court found and the District Court agreed, "when Regal went into bankruptcy, it gained tremendous leverage and its rejection of the old Regal-NCM ESA forced NCM into a new more theater friendly deal." ROA.16761; *see also* ROA.14918-20 (detailing potential negative consequences for NCM if Regal had rejected its ESA). AMC and Cinemark seek to obtain the terms Regal secured only through its bankruptcy leverage while keeping significant upfront distributions and payments they received from NCM—all to the detriment of NCM and its stakeholders.

This result is not authorized by the ESAs. It also runs contrary to the aim of bankruptcy, which, "by definition, often adversely affects the interests

of other parties" in order to enhance the value of the estate. *In re J.C. Penney Direct Mktg. Servs., LLC*, 50 F.4th 532, 534 (5th 2022).  AMC and Cinemark should not be gifted "a windfall merely by reason of the happenstance of bankruptcy." *Butner* v. *United States*, 440 U.S. 48, 55 (1979) (quotation and citation omitted).

### D.     The MFN Clauses Also Were Not Triggered Because Regal Was Not a "Founding Member" When It Signed the NATA.

As discussed above, the MFN Clauses can only be triggered by an "agreement, amendment or extension" that NCM enters into with a "Founding Member." ROA.15157-58.  The Bankruptcy Court did not abuse its discretion, or err at all, in holding that the NATA did not trigger the MFN Clauses on the basis that Regal was not a "Founding Member" when it entered into the NATA.

Months before it entered into the NATA, Regal redeemed all of its Common Units and thus ceased being a "Founding Member" under the LLC Agreement.  ROA.15190-91; ROA.15436.  And immediately before it entered the NATA, Regal executed the Termination and Settlement Agreement, thereby forfeiting all rights under the JV Agreements, and ceasing to be a "Member" of NCM altogether.  ROA.16545-48.

Regal's status under the LLC Agreement and the other JV Agreements matters in interpreting the references to "Founding Members" in the ESA because these are integrated agreements, and the ESAs define "Founding Member" by reference to Regal's status as a party to the LLC Agreement and a "Member[]" of NCM:

> WHEREAS, American Multi-Cinema, Inc. ("AMC"), AMC Showplace Theatres, Inc. ("AMC Showplace"), Regal, Regal CineMedia Holdings, LLC ("RCH") and Cinemark Media, Inc. ("Cinemark Media") ***are parties to that certain Third Amended and Restated Limited Liability Company Operating Agreement, dated as of February 13, 2007, as amended (the "LLC Agreement")***, which governs the rights and obligations of AMC, AMC Showplace, Regal, RCH and Cinemark Media (collectively, the "Founding Members") and National CineMedia, Inc. ("National CineMedia") ***as Members of the LLC***.

ROA.14928 (emphases added). Because Regal was not a party to the LLC Agreement or a "Member" of NCM when it signed the NATA, the Bankruptcy Court correctly concluded that Regal was not a "Founding Member" for purposes of the MFN Clauses.

AMC and Cinemark seek to read the references to the LLC Agreement and LLC membership out of the "Founding Members" definition. Opening Br. 39. But, as the Bankruptcy Court also correctly found, the ESAs and other JV Agreements are integrated, ROA.15836:18-20, meaning that the definitions across the documents should be read consistently. *See, e.g.*, *Pers. Sec. & Safety*

44

*Sys. Inc.* v. *Motorola Inc.*, 297 F.3d 388, 393 (5th Cir. 2002); *In re Nat'l Collegiate Student Loan Trs. Litig.*, 251 A.3d 116, 144 (Del. Ch. 2020).

AMC and Cinemark acknowledge that "[t]hese agreements were designed to work cohesively," Opening Br. 53, but assert that the LLC Agreement should be ignored here in favor of their interpretation of the ESAs that disregards the reference to that other agreement, Opening Br. 40. The Bankruptcy Court did not abuse its discretion, or even err, in finding that Regal was not a "Founding Member" of NCM when it executed the NATA.

## II.    THE CONFIRMATION ORDER IS CONSISTENT WITH SECTION 365 OF THE BANKRUPTCY CODE.

### A.    No Defaults Under the ESAs Barred Their Assumption.

AMC and Cinemark's argument that NCM could not assume their ESAs consistent with section 365 of the Bankruptcy Code rises and falls with their MFN Clauses argument. The Bankruptcy Court correctly found, and the District Court affirmed, that NCM's entry into the NATA did not trigger the MFN Clauses and that NCM cured all other applicable defaults under the ESAs. ROA.16763, 16768. Accordingly, NCM satisfied all relevant requirements under section 365 to assume AMC's and Cinemark's ESAs on the Effective Date.

If the debtor is in default under the terms of an executory contract, section 365(b)(1) requires that at the time of assumption—here, the Plan's Effective Date—the debtor:  (i) cure, or provide adequate assurance that the debtor will promptly cure, the default; (ii) compensate, or provide adequate assurance that the trustee will promptly compensate, the counterparty to the contract for any actual pecuniary loss resulting from the default; and (iii) provide adequate assurance of future performance under the contract. 11 U.S.C. § 365(b)(1).

By its terms, section 365(b) applies only when there has been a default; because the MFN Clauses were not triggered, NCM did not have any non-monetary defaults to cure.  *See, e.g.*, *In re Jack Cnty. Hosp. Dist.*, 2022 WL 829172, at *9, 14 (Bankr. N.D. Tex. Mar. 18, 2022).

The remaining requirements under section 365(b)(1) are not in dispute. As to the monetary defaults under the ESAs, NCM issued to each of AMC and Cinemark agreed-upon cure amounts under the ESAs on the Effective Date. ROA.15651-52.  Accordingly, the ESAs were properly assumed under the Bankruptcy Code.

### B.    AMC Waived Its Objection as to When the CUAA Units Were Issued by Failing to Timely Raise It.

AMC also argues that it must be permitted to exercise its Redemption Right with respect to the CUAA Units in order for NCM to assume AMC's ESA and other JV Agreements.  ROA.15238-39.  As both the Bankruptcy Court and District Court recognized, AMC failed to timely raise this argument in the Bankruptcy Court, ROA.15934:14-17, 15937:7-13; ROA.16767-68, and this Court should decline to address it now.

To preserve an argument for appeal, a "litigant must press and not merely intimate the argument during the" trial court proceedings.  *United States* v. *Joseph*, 102 F.4th 686, 691 (5th Cir. 2024) (quotation omitted).  Further, the argument must be "raised to such a degree that the [trial] court has an opportunity to rule on it."  *Id.* (quotation omitted).

AMC failed to raise any challenge to the timing of NCM's issuance of the CUAA Units in any pleadings in the Bankruptcy Court.  In its objection to the Plan filed on June 14, 2023, two weeks before confirmation, AMC argued that NCM must issue the CUAA Units to cure defaults under the CUAA and that AMC must be permitted to exercise its Redemption Right, but AMC did *not* argue that NCM must issue the CUAA Units *before* it assumed the CUAA and other JV Agreements on the Effective Date.  ROA.15238-39.  AMC

complains that NCM waited to "reveal its calculated scheme," Opening Br. 52, but AMC was aware from the first day of the bankruptcy filing that NCM had not issued the CUAA Units, Opening Br. 12. Moreover, the initial draft of the Plan filed on April 26, 2023 provided that NCM would cure all defaults on "the Effective Date or as soon as reasonably practicable thereafter," and each subsequent draft of the Plan included the same language. *See* ROA.16591. Nevertheless, as noted by the District Court, AMC chose to wait two months, until the confirmation hearing, to raise its issue. ROA.16765, 16767-68.

AMC asserts that "[t]he District Court's expectation" that AMC "demand cure any earlier is unrealistic and not required by the Bankruptcy Code," and that non-debtors are "without power over the assumption process," Opening Br. 51, but AMC's own authority recognizes that parties may move to compel an assumption decision. *See In re Nat'l Gypsum Co.*, 208 F.3d 498, 506 n.7 (5th Cir. 2000). AMC failed to file such a motion below. ROA.15934:14-17, 15937:7-13; ROA.16767-68. And while AMC notes that the District Court did not specify a deadline by which it should have acted, Opening Br. 52, creditors have a responsibility to monitor and act to preserve their interests in bankruptcy proceedings. *See, e.g., In SVB Fin. Grp.*, 660 B.R. 60, 91 (Bankr. S.D.N.Y. 2024) (noting that "creditors must bear the responsibility for

48

investigating and performing reasonable diligence" to identify and pursue claims against debtors (quotation omitted)).

AMC asserts that because NCM did not itself file a separate assumption motion (which is not required), AMC "did not have an opportunity to make a substantive objection" prior to the Plan filing. Opening Br. 52 n.26. Both the Bankruptcy Court and District Court rejected this argument—AMC could have at any earlier point in time sought to compel the CUAA Unit issuance, but failed to do so. ROA.16767-68. This Court should decline to consider AMC's untimely argument.

## C.    Because AMC's Redemption Right Was Not Triggered as of the Effective Date, NCM Had No Contractual Obligation to Redeem the CUAA Units.

Should the Court reach this argument on the merits, it should affirm the District Court's conclusion that there was no default with regard to AMC's Redemption Right. As of the Effective Date, AMC did not have any contractual right to redeem the CUAA Units, and NCM accordingly was not in default of any obligation to redeem them.

AMC complains that the District Court's ruling "eliminat[es] AMC's contractual benefits," Opening Br. 53-54, while itself ignoring the plain text of the relevant contracts. The Bankruptcy Court and the District Court

correctly found that, based on the applicable timeline under the JV Agreements, which timeline AMC does not dispute, Opening Br. 51, NCM followed the plain text of the CUAA and the LLC Agreement.  ROA.16768.

*First*, NCM issued the determination notice to AMC of the number of issuable CUAA Units on March 29, 2023.  ROA.16766.  *Next*, the CUAA provides that NCM must issue the CUAA Units 10 business days after the determination notice—here, by April 12, 2023.  *Id.*  However, NCM filed for bankruptcy on April 11, 2023.  *Lastly*, under the LLC Agreement, NCM's obligation to redeem the CUAA Units arises only if AMC elects to exercise its Redemption Right by giving written notice to NCM specifying the number of units to redeem and providing a "Redemption Date" three to 10 business days after the notice.  ROA.16531-32.  The Plan became effective and the existing equity, including the CUAA Units, was cancelled before the Redemption Right notice period could run.

NCM "complied with the contracts as written," and, to the extent AMC is displeased with the result from the plain text of the JV Agreements, "neither [NCM] nor the court is required to rewrite the contracts that [NCM] is assuming."  ROA.16768; *see also* Opening Br. 48 (acknowledging that courts must "enforce [a] contract as written" (quotation omitted)); *see also*

50

*ExxonMobil Corp.* v. *Elec. Reliability Servs., Inc.*, 868 F.3d 408, 415 (5th Cir. 2017) (recognizing that "courts will not rewrite agreements to insert provisions parties could have included or to imply restraints for which they have not bargained" (citation omitted)).

### D. No Authority Required NCM to Issue the CUAA Units Before the Effective Date or Prohibited NCM's Cancellation of the CUAA Units.

As the Bankruptcy Court and District Court recognized, AMC does not identify any provision of the CUAA, the LLC Agreement, the Bankruptcy Code, or any other applicable contract or law that limited the Bankruptcy Court's ability to cancel NCM's pre-existing equity or that required NCM to issue the CUAA Units before the Effective Date solely to permit AMC to exercise its Redemption Right. ROA.15930:7-23; ROA.16768.

Here, NCM issued the CUAA Units on the date of assumption and thereby cured its default under the CUAA. AMC states that the cure was a two-step process that required both the issuance of the CUAA Units and their redemption. Opening Br. 56. But, as the District Court noted, this argument finds no support in the CUAA.[5] ROA.16768.

---

[5] Section 365(b)(1) even contemplates that the debtor may cure its defaults *after* assumption, provided that the debtor provides adequate assurance of "prompt" cure. *See, e.g.*, *In re Patriot Place, Ltd.*, 486 B.R. 773, 796 n.6 (Bankr. W.D. Tex. 2013).

The District Court further recognized that "AMC is really seeking [] an exception to the way that all equity interests in NCM were treated under the Plan," a "request for a special status" that "is not supported by the facts or the law." *Id.* Under AMC's view of the world, NCM would have had to cure the issuance of the CUAA Units days *before* NCM assumed the agreements solely to allow AMC to exercise its Redemption Right prior to the Effective Date, while every other creditor of NCM was cured on the Effective Date. Any such special treatment would have placed AMC on unequal footing compared to other contract counterparties, a result that contravenes the Bankruptcy Code's core policy of promoting the equitable treatment of creditors. *See In re Heard*, 84 B.R. 454, 457 (Bankr. W.D. Tex. 1987) (goal of bankruptcy process is "fair and equitable treatment of creditors among themselves").

AMC's urged outcome also would have incentivized others to seek similarly inequitable relief, leading to a result that was not in the best interests of NCM, its estate, or its creditors. *See In re Pilgrim's Pride Corp.*, 453 B.R. 691, 698 (Bankr. N.D. Tex. 2011) (congressional policy on bankruptcy is "that 'equity is equality'—that is, similarly situated creditors should be treated the same"). AMC received the treatment it is entitled to under the Bankruptcy Code and its own contracts. There was nothing improper about the

52

cancellation of AMC's CUAA Units on the Effective Date. And because those CUAA Units were cancelled, there was nothing for AMC to redeem.

## III.  THE APPEAL SHOULD BE DISMISSED AS EQUITABLY MOOT.

In this Circuit, the doctrine of "'[e]quitable mootness' has evolved in bankruptcy appeals to constrain appellate review, and potential reversal, of orders confirming reorganization plans." *In re Pac. Lumber Co.*, 584 F.3d 229, 240 (5th Cir. 2009). The doctrine "recognizes that a point exists beyond which a court cannot order fundamental changes in reorganization actions." *In re Idearc, Inc.*, 662 F.3d 315, 318 (5th Cir. 2011). "Consequently, a reviewing court may decline to consider the merits of a confirmation order when there has been substantial consummation of the plan such that effective judicial relief is no longer available—even though there may still be a viable dispute between the parties on appeal." *In re Manges*, 29 F.3d at 1039.

This Court analyzes three factors in determining whether claims are equitably moot: "(i) whether a stay has been obtained, (ii) whether the plan has been 'substantially consummated,' and (iii) whether the relief requested would affect either the rights of parties not before the court or the success of the plan." *Id.* This Court has repeatedly dismissed appeals—or affirmed

53

dismissals—on equitable mootness grounds based on the *Manges* factors.[6] Each of these factors weighs in favor of dismissal.[7]

### A. The Bankruptcy Court, the District Court, and This Court All Denied AMC and Cinemark's Stay Request.

"[T]he requirement of a stay encapsulates the fundamental bankruptcy policy of reliance on the finality of confirmation orders by the bankruptcy court." *In re Berryman Prods., Inc.*, 159 F.3d at 944. Whether the appellants tried to secure a stay is irrelevant; what matters is whether they actually obtained a stay, *id.* at 944-45, and here, they did not.

---

[6]  *See, e.g., In re Ultra Petrol. Corp.*, 2022 WL 989389, at *5 (5th Cir. Apr. 1, 2022); *In re Thru, Inc.*, 782 F. App'x 339, 340 (5th Cir. 2019) (per curiam); *In re McCray*, 623 F. App'x 184, 185 (5th Cir. 2015) (per curiam); *In re Idearc*, 662 F.3d at 318-20; *In re ASARCO L.L.C.*, 401 F. App'x 914, 916-17 (5th Cir. 2010) (per curiam); *In re Premier Ent. Biloxi LLC*, 2009 WL 1616681, at *2-5 (5th Cir. June 9, 2009) (per curiam); *In re Green Aggregates Inc.*, 345 F. App'x 890, 891-92 (5th Cir. 2009) (per curiam); *In re Hilal*, 226 F. App'x 381, 383 (5th Cir. 2007) (per curiam); *In re Hammersmith Dev. Co.*, 2001 WL 184591, at *3-6 (5th Cir. Jan. 30, 2001); *In re GWI PCS 1, Inc.*, 230 F.3d 788, 799-803 (5th Cir. 2000); *In re U.S. Brass Corp.*, 169 F.3d 957, 959-62 (5th Cir. 1999); *In re Berryman Prods., Inc.*, 159 F.3d 941, 944-46 (5th Cir. 1998); *In re Manges*, 29 F.3d at 1038-44; *In re Block Shim Dev. Co.-Irving*, 939 F.2d 289, 291 (5th Cir. 1991).

[7]  AMC and Cinemark point out that NCM did not appeal the District Court's decision declining to reach NCM's equitable mootness argument because it found for NCM on the merits. Opening Br. 18 n.9. Of course, there was no error in the District Court declining to reach the issue when it found in favor of NCM on alternate grounds. Nevertheless, equitable mootness remains a valid alternative ground on which to reject this appeal: "an appellee is not limited to the reasoning of the district court and may raise any argument that is supported by the record to defend the judgment," even "without filing a cross appeal." *See, e.g., In re Green Hills Dev. Co., L.L.C.*, 741 F.3d 651, 655-56 (5th Cir. 2014).

AMC and Cinemark failed to obtain a stay from the Bankruptcy Court, the District Court, and this Court because they consistently failed to demonstrate a likelihood of success on the appeal they now pursue. NCM's stakeholders relied on the denials of the stay requests in supporting and consummating the Plan and Restructuring Transactions. ROA.15550-59; Bankr. Case, No. 4:23-bk-90291, ECF No. 555, Ex. B at 2-3. As a result, the Plan became effective on August 7, 2023 and was substantially consummated.

Indeed, in the absence of a stay, NCM has had a duty to maximize the value of its estate for its stakeholders, and stalling the Restructuring Transactions while AMC and Cinemark appealed would have compromised this duty. *See In re Johnson*, 433 B.R. 626, 638 (Bankr. S.D. Tex. 2010) (finding that debtors have fiduciary duties "to maximize the value of the estate" (quotation and citation omitted)).

## B.    The Plan Has Been Substantially Consummated.

The Plan has been substantially consummated and implemented following its confirmation nearly a year-and-a-half ago. The Bankruptcy Code defines "substantial consummation" to mean:

(A)    transfer of all or substantially all of the property proposed by the plan to be transferred;

      (B)      assumption by the debtor or by the successor to the debtor under the plan of the business or of the management of all or substantially all of the property dealt with by the plan; and

      (C)      commencement of distribution under the plan.

11 U.S.C. § 1101(2); *see In re Manges*, 29 F.3d at 1040-41, n.10.

"Substantial consummation" does not mean the "absolute or complete consummation" of the plan. *In re GWI PCS 1, Inc.*, 230 F.3d at 802. Rather, "courts are loath to upset" the expectations of parties where the plan is being implemented and business operations are continuing. *See In re San Patricio Cnty. Cmty. Action Agency*, 575 F.3d 553, 558 (5th Cir. 2009). The Fifth Circuit "has borrowed the 'substantial consummation' yardstick because it informs" the court's "judgment as to when finality concerns and the reliance interests of third parties upon the plan as effectuated have become paramount to a resolution of the dispute between the parties on appeal." *In re Manges*, 29 F.3d at 1041. Accordingly, plan consummation may be dispositive of the question of equitable mootness. *Id.* at 1040-41.

Here, "there has been substantial consummation of the plan such that effective judicial relief is no longer available." *Id.* at 1039. *First*, consistent with section 1101(2)(A) and the Plan, on the Effective Date, "all Causes of Action, and any property acquired by the Debtor under the Plan [] vest[ed] in

the Reorganized Debtor, free and clear of all Liens, Claims, charges, or other encumbrances." ROA.15555.

*Second*, pursuant to section 1101(2)(B), NCM has been operating its business continuously since the Effective Date as a reorganized entity. NCM has assumed and continued to perform under its existing contracts, entered into other agreements, drawn on its exit facility to fund operations, and granted liens on substantially all of its property in favor of the exit facility lender.[8]

*Finally*, NCM has not only "commence[d]" but has substantially completed distributions under the Plan. 11 U.S.C. § 1101(2)(C). As of the Effective Date, NCM equitized nearly $1 billion in secured debt (meaning that debt held by numerous parties was converted into equity in the reorganized NCM), cancelled all of NCM's existing equity, completed distributions to holders of General Unsecured Convenience Claims, and substantially completed the pro rata distribution of the GUC Cash Pool. Bankr. Case, No. 4:23-bk-90291, ECF No. 609 at 11; ROA.15549. Further, all Secured Debt

---

[8] *See* Nat'l CineMedia, Inc., National CineMedia Successfully Completes Financial Restructuring And Announces New Board Of Directors (Form 8-K Ex. 99.1) (Aug. 7, 2023), https://www.sec.gov/ix?doc=/Archives/edgar/data/1377630/000137763023000124/ncmllc-20230807.htm.

Claims, General Unsecured Convenience Claims, and General Unsecured Claims, among others, were discharged, cancelled, released, and extinguished, including the pre-petition secured creditors' liens. ROA.15547-49.

The closing of these transactions and substantial completion of distributions under the Plan amount to substantial consummation, further supporting a finding of equitable mootness. *See, e.g.*, *In re U.S. Brass Corp.*, 169 F.3d at 961 (finding plan to be substantially consummated due to "the transactions that have taken place to date, the exchange of mutual releases, the disbursements already made, and the general implementation of the plan"); *In re ASARCO, L.L.C.*, 401 F. App'x at 917 (same, where debtor had initiated creditor distributions, facilitated settlements with various parties, and transferred property).

### C. The Relief That AMC and Cinemark Seek Would Severely Harm the Rights of Third Parties and the Success of the Plan.

The third factor is met where, as here, the requested relief would "have a far-reaching impact," "affect numerous complex financial transactions," and make it "difficult to maintain anything resembling the status quo." *In re ASARCO, L.L.C.*, 401 F. App'x at 917. Granting AMC and Cinemark's request for reversal of the Confirmation Order and portions (or the entirety) of the Regal Approval Order would require nothing short of the wholesale

unraveling of the consummated Plan and the multitude of transactions entered into between NCM, its stakeholders, and other parties in interest. The claims at issue should accordingly be found equitably moot. *See In re Ultra Petrol. Corp.*, 2022 WL 989389, at *3 (claims equitably moot where appellants wanted to reverse confirmation order and unwind plan); *In re Thru, Inc.*, 2018 WL 5113124, at *14 (N.D. Tex. Oct. 19, 2018) (similar), *aff'd*, 782 F. App'x 339.

Reversal of the Confirmation Order would upend the Restructuring Transactions under the Plan, which are incapable of being reversed without significant disruption and prejudice to third parties. For example, NCM has substantially completed distributions under the Plan, including fully equitizing the secured debt into shares of NCM, Inc. common stock and making distributions to unsecured creditors. Bankr. Case, No. 4:23-bk-90291, ECF No. 609 at 11. And it is not possible to grant AMC's request to exercise its Redemption Right under the LLC Agreement with respect to the CUAA Units, even if the Confirmation Order is reversed. Consistent with the Confirmation Order, the CUAA Units were issued on the Effective Date and cancelled—along with NCM's other existing equity—the same day. *Id.*; ROA.15549; ROA.15626.

Further, contrary to AMC and Cinemark's suggestion, Opening Br. 44-46, it is impossible just to reverse the portions of the Regal Approval Order finding that the MFN Clauses were not triggered and somehow preserve the remainder of the Order and the Regal Agreements. NCM and its advisors determined that, if the MFN Clauses were triggered, NCM would "operate with substantially reduced or negative profitability and struggle to remain cash flow positive." ROA.15586 (quotation omitted); ROA.14920-21. Accordingly, the Bankruptcy Court found that, in NCM's business judgment, NCM would not have entered into the NATA with Regal if it triggered the MFN Clauses because doing so would have risked NCM's liquidation. ROA.15586.

And, because NCM's entry into the Regal Agreements was governed by section 363(b) of the Bankruptcy Code, the Bankruptcy Court could not have authorized such entry if it was not an appropriate exercise of NCM's business judgment and in the best interests of NCM's bankruptcy estate. ROA.15585-86, 15588-89. As the District Court affirmed, "the evidence supports the fact that" entering into the NATA—which NCM would not have done if it triggered the MFN Clauses—"was a necessary business move for NCM to make in order to emerge from its own bankruptcy with a brighter future."

60

ROA.16763.  Excising the Bankruptcy Court's findings regarding the MFN Clauses would therefore gut both the factual and legal bases on which the Bankruptcy Court entered the Regal Approval Order, severely jeopardizing the success of NCM's restructuring.

Moreover, numerous customers, vendors, and third parties not before the Court would be negatively impacted by a reversal of the Bankruptcy Court's orders.  NCM assured its potential advertisers that Regal would remain a part of NCM's advertising network and that NCM would continue to operate the largest theater advertising network in North America. ROA.16520-21. These parties have continued or entered into transactions with NCM in reliance on the effectiveness of the Plan and NCM's entry into the NATA. *See id.*

This Court also has dismissed appeals of confirmation orders when entering the relief requested would significantly alter the deal negotiated during the restructuring.  *See In re Crystal Oil Co.*, 854 F.2d 79, 81, 82 (5th Cir. 1988) (dismissing appeal as moot, finding that requested relief (a) was "fundamentally unfair" to critical creditor who had negotiated and made concessions under the plan as confirmed and (b) would likely "destroy the

present plan and require the bankruptcy court to start anew").[9]  Here, too, NCM negotiated certain transactions and settlements and emerged from bankruptcy with a network of theaters that includes Regal under the NATA, and AMC and Cinemark under their ESAs.

It is now impossible to restore the status quo pre-confirmation without dramatically and negatively impacting third parties and the success of NCM's consummated Plan.  The Restructuring Transactions, many of which are irreversible, should not be disturbed.

## CONCLUSION

The Court should affirm the District Court's order affirming the Bankruptcy Court's Regal Approval Order and Confirmation Order or, in the alternative, dismiss the claims in this appeal as equitably moot.

---

[9]  AMC and Cinemark are contractual counterparties that asserted *unsecured* claims against NCM, which this Court has found weighs in favor of a finding of equitable mootness.  *See In re McCray*, 623 F. App'x at 185 (dismissing appeal on equitable mootness grounds in part because it "does not impact secured creditors").  Therefore, any concerns about secured creditors' property rights are not implicated here. *See In re Pac. Lumber Co.*, 584 F.3d at 243.

Respectfully submitted,

|  |  |
|---|---|
| | s/ *KYLE J. KIMPLER* |
| JOHN F. HIGGINS | PAUL M. BASTA |
| ERIC M. ENGLISH | KYLE J. KIMPLER |
| M. SHANE JOHNSON | JEFFREY J. RECHER |
| MEGAN N. YOUNG-JOHN | NINA KOVALENKO |
| PORTER HEDGES LLP | SHAFAQ HASAN |
| *1000 Main Street, 36th Floor* | PAUL, WEISS, RIFKIND, |
| *Houston, TX 77002* | WHARTON & GARRISON LLP |
| | *1285 Avenue of the Americas* |
| | *New York, NY 10019* |

NOVEMBER 27, 2024

# CERTIFICATE OF SERVICE

I, Kyle J. Kimpler, counsel for National CineMedia, LLC and a member of the Bar of this Court, certify that, on November 27, 2024, a copy of the attached Brief of Appellee National CineMedia, LLC was filed with the Clerk through the Court's electronic filing system. I further certify that all parties required to be served have been served.

*s/ Kyle J. Kimpler*

KYLE J. KIMPLER

## CERTIFICATE OF COMPLIANCE
## WITH TYPEFACE AND WORD-COUNT LIMITATIONS

I, Kyle J. Kimpler, a member of the Bar of this Court and counsel for appellee National CineMedia, LLC certify, pursuant to Federal Rule of Appellate Procedure 32(a)(7)(B) and Fifth Circuit Rule 32.3, that the attached Brief of Appellee National CineMedia, LLC is proportionately spaced, has a typeface of 14 points or more, and contains 12,960 words.

s/ KYLE J. KIMPLER
KYLE J. KIMPLER

NOVEMBER 27, 2024